# Warfield v. Kelly, Appellant.

*Equity—Forfeiture—Expenditure of money given for a stated purpose—Corporations — Profits and dividends — Interchangeable use of words.*

1. The forfeiture which equity abhors is one which works a loss contrary to equity.

2. One who contributes money to be expended for a given purpose cannot be heard to complain if it be expended therefor, though it might have been more wisely expended for some other purpose.

3. Where in an agreement between shareholders of a corporation the words profits and dividends are used interchangeably they will be so construed, although, as between those shareholders and the corporation itself, they have different meanings.

Argued Oct. 2, 1918. Appeal, No. 36, Jan. T., 1919, by defendants, from decree of C. P. Centre Co., Dec. T., 1914, No. 2, in equity in case of Emily Harris Warfield, Administratrix of Frank Warfield, deceased, v. Thomas F. Kelly, Isaac B. Norris, William K. Wrigley, Augustus Z. Wolf, William Wingert, W. H. McIntire, Elizabeth S. Meyer, Henry C. Quigley, Samuel Saylor, Nellie M. Love, C. S. Russell and Kato Coal Company, of whom Thomas F. Kelly, Isaac B. Norris, William K. Wrigley,

Augustus Z. Wolf, William Wingert and Kato Coal Company were appellants. Before BROWN, C. J., STEWART, WALLING, SIMPSON and FOX, JJ. Reversed.

Bill in equity for an accounting of the proceeds of cancellation of a stock certificate of 240 shares of stock of the Kato Coal Company, and of all moneys paid into the Kato Coal Company by Frank Warfield, and as amended for a decree declaring null and void the forfeiture of stock, and to compel the issuing of 65 shares of the Kato Coal Company's stock to plaintiff, and for an accounting of the profits of the Kato Coal Company for a purpose stated. Before JOHNSON, P. J., specially presiding.

The court entered a decree in favor of the plaintiff, according to the amended prayers of the bill.

*Error assigned* was the decree of the court.

*A. M. Liveright,* for Isaac B. Norris, William K. Wrigley, Augustus Z. Wolf, William Wingert and Kato Coal Company, appellants.

*John Blanchard,* of *Blanchard & Blanchard,* for Thomas F. Kelly, appellant.—Kelly had no interest in the profits until a dividend was earned and declared: Goetz's Est., 236 Pa. 630; Mobile, Etc., R. R. Co. v. Tennessee, 153 U. S. 486.

Directors have a discretionary power to determine not only the amount of all dividends, but also whether under given circumstances they will declare any dividend. In the absence of bad faith they have control of the whole subject and their action is binding upon the stockholders: McLean et al. v. Pittsburgh Plate Glass Co., 159 Pa. 112.

Dividends differ from profits in being taken by a competent authority out of the general property and transferred to separate property of the stockholders: City of Allegheny v. Pittsburgh, Allegheny, Etc., Ry. Co., 179 Pa. 414; Rose v. Barclay et al., 191 Pa. 594.

The responsibility of directors for wrongfully paying dividends when there is a shortage of working capital is discussed by this court in Cornell v. Seddinger, 237 Pa. 389.

In general equity abhors a forfeiture but not where it works equity: Munroe v. Armstrong, 96 Pa. 307, 310; Brown v. Vandergrift, 80 Pa. 142, 148; Germantown Pass. Ry., Etc., v. Fitler, 60 Pa. 124.

*Charles F. Hewes,* for appellee.—In order to sustain a forfeiture of property every condition precedent must be strictly and literally complied with: Morris v. Land Co., 164 Pa. 326; Germantown Pass. Ry. Co. v. Fitler, 60 Pa. 124; McLean v. Pittsburgh Plate Glass Co., 159 Pa. 112.

Under any view of the case the forfeiture of Kelly's stock was unwarranted and void: Jeannette Bottle Works v. Schall, 13 Pa. Superior Ct. 96; Densmore Oil Co. v. Densmore, 64 Pa. 43.

OPINION BY MR. JUSTICE SIMPSON, January 4, 1919:

Both appellant and appellee state in their paper books that "the evidence in this case is undisputed," and the former adds "counsel for appellee frankly admits that the appellants have not tried to cover up or keep anything from the court, but that they have submitted fully whatever evidence they possess." That frankness has materially aided us in considering this complicated record, which sets forth 107 requests affirmed and 56 refused by the court below, in addition to the court's own findings; and 123 exceptions, of which 18 were sustained without any reason being assigned so far as the facts were concerned, and 105 were overruled. It also shows that in two instances where both parties excepted generally to a finding, the exceptions of one party thereto were sustained and those of the other overruled; and in two other instances prior findings were reversed, though no exceptions were taken thereto. Because of the com-

plications thus occasioned we deem it necessary to set forth herein the salient facts upon which our conclusion is based.

On February 28, 1910, Thomas F. Kelly purchased at sheriff's sale, on foreclosure of a paramount mortgage, a property in Centre County, Pennsylvania, on which was a partially developed coal mine theretofore leased by him from one Samuel Saylor. The purchase-price was $61,-000, of which $1,000 was paid at the time of the sale. Associated with him in the purchase were five other people, residing in Centre County, hereinafter called the Centre County parties. One of them was Frank Warfield, whose administratrix is plaintiff in this case. These parties were unable to raise the necessary funds to complete the purchase, and the sale was in danger of falling through. With the assent of his associates, Kelly induced four persons residing in Clearfield County, hereinafter called the Clearfield County parties, to become interested in the matter. The result of their negotiations was a written agreement dated November 9, 1910.

This agreement, after reciting the purchase aforesaid, specified that Kelly should take title to the property; should mortgage it in the sum of $30,000, the money to be used in paying the sheriff; that the Clearfield County parties should pay $35,600, $30,000 of which should be used in payment of the balance of the purchase-price; that a corporation, to be named the Kato Coal Company, should be formed to take over the property and operate it; that a loan of $5,000 should be made by William Wingert, one of the Clearfield County parties; that the capital stock of the Kato Coal Company should be 480 shares of the par value of $100 each, one-half of which was to be given to the Clearfield County parties absolutely, and the other half to Kelly and his associates, but to be held by one C. S. Russell, to secure the payment of the $30,000 mortgage and $3,500 of the $5,000 note, out of the profits of the corporation, if sufficient, and, if not, by Kelly. Inasmuch as Kelly and the Centre County

parties had put but little money into the enterprise, and the large cash contribution of the Clearfield County parties was bound by the mortgage, it was further provided in the agreement: "The said Russell to hold the said shares of stock to him so delivered in trust until the said mortgage and interest shall be paid by the said Thomas F. Kelly, and the said Russell shall then deliver back the said stock to the said Thomas F. Kelly. The said Kelly agrees to not get in default in the payment of said mortgage or its interest for a longer period than six months, and further agrees that if he does get in default for a longer period than six months the said shares of stock which he shall have put in the hands of the said Russell shall be delivered by the said Russell to the other gentlemen whose names appear at the head of this writing [the Clearfield County parties] they to divide the said Kelly stock among themselves or among the persons who may hold their stock at the time it shall be so delivered by the said C. S. Russell in the proportion in which the said other stock may be held by stockholders of the said Kato Coal Company; and the said Russell is hereby authorized to deliver the said Kelly stock to the then stockholders of the said company and to divide the said Kelly shares among the then stockholders in the same proportion as the other stock is held by them, the said stockholders."

It is also provided that the company, when formed, should pay to Saylor, the former owner, the sum of $5,000, and should purchase from Kelly his personal property on the premises. No price was fixed therefor, but it was later appraised and purchased for $5,000.

That agreement was fully carried out, the title was taken, the mortgage created, the corporation formed, the property transferred to it, the stock issued, one-half thereof delivered to Russell upon said trust, and the other half to the Clearfield County parties.

From the foregoing recital it is evident that the enterprise was foredoomed to failure, unless additional money

was obtained from some source. After paying for the property, the corporation was still indebted to Wingert, Kelly and Saylor in the sum of $5,000 each, had a mine which had to be developed and operated, was under contract to Kelly to pay him $150 per month salary as manager, and taxes and interest were accruing. To meet those debts and expenses it had a working capital of but $10,600, and had made no provision in the agreement for the raising of additional money.

For some time Kelly and the Centre County parties had no written agreement as between themselves; but on August 29, 1911, they entered into two several agreements, to define their relations towards said property and towards each other. These agreements were, by their terms, "subject, however, to the fulfillment of the said prior agreement of November 9, 1910." They also provided for the ultimate division of the 240 shares among said parties, Warfield to get 51 and Kelly 79 shares thereof; that Kelly should be a voting trustee for all of said stock, voting it as he deemed best, unless directed otherwise by the owners of a majority of the shares; that the dividends and profits of said 240 shares should be applied so far as needed to carry out the provisions of the agreement of November 9, 1910; that if all thereof were not needed for that purpose the balance should be divided among the parties in interest proportionately to their prospective stock ownership; if the dividends and profits "should be insufficient to meet the requirements of the said agreement of November 9, 1910, and if any of the beneficial owners [excluding Samuel Saylor and Nellie M. Love]......should fail to contribute his, her or their part or parts of such deficiency" and the others make up the amount, those not contributing "shall forfeit absolutely" to the others so much of their stock, at par, as shall make up the sums so contributed, and in case of a failure to comply with the agreement of November 9, 1910, "the said 240 shares shall thereupon be

delivered to said other parties to said agreement of November 9, 1910, as therein provided."

By an agreement of October 28, 1911, it was stipulated that Kelly and Warfield were joint owners of the 130 shares of stock, to which they ultimately would be entitled under the agreement of August 29, 1911.

The Kato Coal Company had not been long in operation before it became evident that more money was needed, and from time to time demands were made therefor. Some profits were made, if necessary improvements are not considered, but how much does not appear. They were all used in developing the property. Had they not been so used work would have stopped. At no time was there money on hand sufficient to pay the debts. Kelly contributed money, out of his own funds, until, on May 1, 1913, the sums thus contributed, with interest, amounted to $13,652.10. Warfield also contributed money and the amount due him on the same date, with interest, amounted to $1,789. Two of the other Centre County parties made contributions, as did also the Clearfield County parties. The Centre County parties paid their money to Kelly, who with their consent used it in paying taxes, interest on mortgage and the expenses of developing and operating the mine. It was essential that it should be so used. On May 1, 1913, the Wingert note was overdue and unpaid, and payment thereof had been asked; the mortgage was due because of nonpayment of interest; other debts were due and pressing, and the work of development was imperilled for want of funds, and none of the Centre County parties were willing to contribute anything. Kelly called a meeting of those parties, and no one attended. He then went to see them, and advised them if money was not forthcoming the Clearfield County parties would proceed under the agreement of November 9, 1910. Still they did nothing. Warfield having died January 18, 1912, and plaintiff having been appointed administratrix of his estate, Kelly from time to time saw her father and

brother, whom he supposed were acting for her, and advised them of the situation. They said they would raise some money to help pay the Wingert note, but actually did nothing. At the trial plaintiff denied that they were acting for her, though they were living with her; but even then would not answer what she would do until after she had advised with her father. She had a copy of the agreement of November 9, 1910, but she never did nor offered to do anything to relieve the situation, or made any inquiries in regard to the matter.

On May 1, 1913, Kelly had advanced far more than his proportion, and refused to advance any more. Disaster was imminent, and the Clearfield County parties, whose interests would be destroyed by a foreclosure of the mortgage, called a meeting for June 3, 1913, to take action under the agreement of November 9, 1910. At that meeting, it was resolved to cancel the 240 shares of stock in which the Centre County parties were interested, but inasmuch as they had advanced money for the general benefit, a calculation was made showing that the stock was then worth in the neighborhood of $200 per share, and there was allotted to each of those parties the number of shares to which they would have been entitled if, with the money they had theretofore paid, they were then purchasing the stock at that figure. This gave to plaintiff nine shares, and to Kelly 68 shares. At that figure 25 shares were given to Wingert in payment of his $5,000 note; 18-32/308 additional shares were given to Kelly, and the balance was divided among the Clearfield County parties, in the proportion set forth in the agreement of November 9, 1910. Kelly voted with the other shareholders for the distribution stated. By it the Centre County parties were relieved from personal liability for the mortgage and the Wingert note, in addition to receiving stock in the company proportionate to their actual cash contributions up to that date.

All the parties in interest accepted this settlement except plaintiff. She protested that it was not fair and

just to her in view of the services which her husband had rendered to the company. She was offered cash for the amount paid by him, with interest as above, and would not accept it. Kelly offered to pool all the stock he received in that settlement, with her nine shares, and to give to her one-half thereof, provided she paid to him a sum sufficient to equalize his excess payments after November 9, 1910. She refused that proposition also; and filed the bill in equity in this case, praying originally for an accounting for the proceeds of the cancellation of the 240 shares of stock, for all moneys paid by Warfield, and for his time and services rendered to the company. Later she amended her prayers to ask that the action of the board of directors at the meeting of June 3, 1913, be decreed null and void; that they be required to issue to her a certificate for 65 shares of stock; and for an accounting of the profits of the company from its organization, to enable her to determine how much she must pay in order to satisfy the mortgage. In her bill she nowhere alleges fraud on the part of the defendants, or any of them; or even that the distribution was unfair or unjust, or not in accordance with the agreement of November 9, 1910; but only denies the power of the board of directors to cancel the certificate for the 240 shares, and redistribute that stock. Nor does she aver that any profits were earned by the corporation out of which the mortgage interest or Wingert note could have been paid, that she or her decedent were ready or willing to contribute to pay said interest or note, or that she is even now ready or willing to carry out the terms of the agreement, or to otherwise do equity, if the status quo ante is restored.

At the trial when she was asked whether or not she was prepared to carry out the terms of the original agreement if the status prior to June 3, 1913, was restored, she declined to say whether or not she would do so, because she did not know how her business was; but she admitted that she had never offered to do so, and had

made no effort to find out what her duties and liabilities were under the agreement of November 9, 1910.

The court below entered a decree for plaintiff according to the amended prayers of the bill, and therefrom this appeal is taken. The basis of the decision is threefold: (1) Equity abhors a forfeiture, and hence the agreement of November 9, 1910, in regard thereto, must be strictly construed; (2) When Kelly was paid money by the other Centre County parties, it was his duty to apply it in payment of the mortgage interest and the Wingert note; and (3) the agreement of November 9, 1910, provided for the application of the profits of the corporation to the payment of the mortgage interest and the Wingert note, and hence it was immaterial whether or not dividends were declared by the corporation.

It is, of course, true as a general proposition, that equity abhors a forfeiture, and that agreements providing therefor must be strictly construed. But this is true only where it works a loss that is contrary to equity: Brown v. Vandegrift, 80 Pa. 142; Munroe v. Armstrong, 96 Pa. 307; Chauvenet v. Person, 217 Pa. 464, 474. Here no such loss is occasioned. Moreover, strictly speaking there was no forfeiture in the present case. Plaintiff's decedent was to receive his stock when the mortgage debt with interest, and $3,500 of the Wingert note, with interest, were paid by him and his associates. They never were paid; and he and they neglected or refused to further contribute towards their payment. Pro tanto the consideration for the stock failed. The Clearfield County parties, who had paid in cash and not promises to pay, were not obliged to agree to an indefinite postponement of compliance with the agreement of November 9, 1910, and to leave their contribution subject to loss by foreclosure of the mortgage, which plaintiff and her associates had obligated themselves to pay and had not paid. Whether or not the Clearfield County parties could have stood on the strict letter of that agreement, and retained all the stock for their own use, we are not

called upon to decide. They did not do so, but gave to plaintiff stock for the money and interest which her decedent had contributed, and offered to give her cash therefor, if she preferred. She would accept neither, and would not even say that she would do her part, if the original status was restored. We are unable to see any equity in her position. On June 3, 1913, when the settlement was made, the Centre County parties had already paid $20,019.45, including interest, the $30,000 mortgage was still unpaid, and there was $1,182.50 interest due thereon, and the $3,500 of the Wingert note was still unpaid. Those sums aggregate $54,701.95. Had they paid the balance of those sums, said parties would have received the 240 shares of stock; but to have done so would have made each share cost them more than $240. By the settlement they received stock at $200 per share for all their payments, with interest, and were relieved from personal liability for the mortgage and Wingert note. Surely that cannot be called a forfeiture of their rights; especially as it gave to them that which they were no longer willing to preserve to themselves.

Nor is the second reason any more helpful to plaintiff. As has been shown, Kelly received the money for the purpose of expending it as he did. Some of it did go to the interest on the mortgage. Had none of it been so used, plaintiff could not complain, for it was applied exactly as it was intended it should be. It was essential to so apply it to allow the operation to go on, and plaintiff admits, in her paper book, that it was "sound business policy" to so expend it.

Nor is plaintiff helped by the court's construction of the agreement of November 9, 1910. If we assume that the profits and dividends of a company are ordinarily different things, the result would be the same as if they were ordinarily the same. In the present case they were evidently used interchangeably, or, if not, both were provided for, for by the agreements of August 29, 1911, signed by plaintiff's decedent, it was provided that the

dividends and profits should be applied to meet these claims, and that the Centre County parties would make up any deficiency. As the parties were expecting to develop a small and heretofore unproductive mine, money had to come from some source, there was an inadequate capital and no other provision was made for advancements by any of the parties. Hence the course pursued was exactly what every one must have anticipated, and doubtless for that reason the agreements of August 29, 1911, so provided.

The decree of the court below is reversed and the bill in equity is dismissed, at the costs of appellee, without prejudice to any right plaintiff may have to demand and receive from the Kato Coal Company the nine shares of stock set apart to her by the stockholders of said company at its meeting held June 3, 1913, upon payment by plaintiff of the amount due by her as set forth in the letter of February 4, 1914, sent to her by said company.